**Delbert SHAFFNER and Eula Shaffner, Plaintiffs–Respondents,**

v.

**FARMERS MUTUAL FIRE INSURANCE COMPANY OF ST. CLAIR COUNTY, Defendant–Appellant.**

No. 18415.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 2, 1993.

Motion for Rehearing or to Transfer
Denied Aug. 23, 1993.

Application to Transfer Denied
Sept. 28, 1993.

J.D. Baker, Baker & Dull, Osceola, for defendant-appellant.

· James C. Johns, Cason, Edgett, Johns & Mahan, Clinton, for plaintiffs-respondents.

FLANIGAN, Judge.

In the early morning of April 21, 1991, a dwelling house owned by plaintiffs Delbert Shaffner and Eula Shaffner was destroyed by fire. On that date, plaintiffs were the insureds under a fire insurance policy issued by defendant. In this action to collect the policy proceeds, the jury returned a verdict in favor of plaintiffs. The trial court entered judgment on the verdict in the sum of $20,234.40, together with prejudgment interest. Defendant appeals.

Among the "Standard Provisions" of the policy was the following: "[T]his Company shall not be liable for loss occurring ... (b) while a described building, whether intended for occupancy by owner or tenant, is

vacant or unoccupied beyond a period of sixty consecutive days." The house was "a described building."

Both sides presented evidence. At the close of all the evidence defendant filed a motion for directed verdict on the following ground: "The evidence shows that the dwelling house which is the subject of this action was vacant or unoccupied beyond a period of sixty consecutive days prior to the fire loss and as a matter of law, defendant is entitled to judgment." The motion was denied. Following entry of judgment, defendant filed a motion for new trial and a motion for judgment notwithstanding the verdict. The motions were overruled and this appeal ensued.

Defendant contends that the trial court erred (a) in denying its motion for directed verdict, (b) in refusing to give two instructions, Instruction A and Instruction B, which were offered by defendant, and (c) in giving Instruction 6.

Defendant contends that the trial court erred in denying its motion for directed verdict because, as a matter of law, the uncontroverted evidence showed that the house was vacant or unoccupied for a period of more than 60 days prior to the fire. The parties agree that the policy provision upon which defendant relies constitutes an affirmative defense on which defendant had the burden of proof.

■ In reviewing the trial court's ruling on defendant's motion for a directed verdict this court must view the evidence in the light most favorable to the plaintiffs, and they are to be given the benefit of all reasonable inferences. *Black v. Kansas City Southern Ry. Co.*, 436 S.W.2d 19, 23[1] (Mo. banc 1968). "A [trial] court should never withdraw a question from the jury, unless 'all reasonable men, in the honest exercise of a fair, impartial judgment, would draw the same conclusion from the facts which condition the issue.' ... Where there is uncertainty arising 'from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury.'" *Walton v. United States Steel Corporation*, 362 S.W.2d 617, 621[2] (Mo. 1962).

■ Ordinarily, a court is not justified in directing a verdict in favor of the party having the burden of proof when the evidence relied on consists of oral testimony. *Price v. Bangert Brothers Road Builders, Inc.*, 490 S.W.2d 53, 57 (Mo.1973); *Strang v. Deere, & Co.*, 796 S.W.2d 908, 913[2] (Mo.App.1990). Generally, a directed verdict will not be granted to the party carrying the burden of proof. However, an exception to this general rule is recognized when plaintiff's evidence establishes that recovery is barred by an affirmative defense. *Jerry Anderson & Assoc., Inc. v. Gaylan Ind., Inc.*, 805 S.W.2d 733, 735 (Mo.App.1991).

Plaintiffs presented the testimony of plaintiff Delbert Shaffner, Donnie Murray, Rhonda Weaver, and Charles Sheldon. Defendant's evidence consisted of admissions of Delbert Shaffner contained in his deposition. Defendant's brief says: "At trial, the sole issue was whether the residential dwelling had been vacant or unoccupied for more than 60 days prior to the fire." With respect to that issue, there was no factual dispute.

In 1971, plaintiffs acquired title to the house and the 200 acres on which it was situated. Except for the house and its immediate yard area, most of the farm was rented by Shaffner to Donnie Murray as cattle pasture. Plaintiffs never lived in the house and used it as a rental house.

The last tenants to live in the house were the Blevins family, who lived there two years and moved out in November 1990. The Blevinses were the last people to stay overnight in the house, and that occurred on November 3, 1990. In November 1990, the electricity to the house was turned off and was still turned off on the date of the fire. Water to the house was provided by a well and pump which operated on electricity, and the house was without water after November 20, 1990. After the Blevinses moved out, Shaffner drained all the water from the pipes.

Shaffner testified that on March 31, 1991, he rented the house to Raymond and Rhonda Weaver. He discussed with the Weavers the fact that the house needed some clean-up and repairs. It was agreed that Shaffner would furnish the wallpaper and material and the Weavers would help Shaffner do the work.

On April 2, the "clean-up and fix-up" began. Between April 2 and April 21, Shaffner and Mr. and Mrs. Weaver were present at the house almost daily, cleaning up, redecorating, and making repairs. That work included stripping wallpaper, repapering the kitchen, washing windows, and working on the chimney. On April 18, most of the work was completed and Shaffner gave the Weavers a key to the house. The Weavers were going to have the electricity turned on during the week of April 21, and they were to start paying rent to Shaffner on May 1. On occasion during the clean-up work, the Weavers and Shaffner ate meals at the house.

Prior to the fire, the Weavers had not moved any of their furniture or appliances into the house, but had moved cleaning supplies. The contents which remained in the house after the Blevinses moved out included a Warm Morning stove, an antique incubator, and a chair. At the time of the fire, contents of the house included the Warm Morning stove, the antique incubator, a kitchenette table, a dinette chair, a lawn chair, a step ladder, and tools used in connection with cleaning and repapering. Shaffner testified that he did not provide his different tenants furniture or appliances other than the Warm Morning stove. On April 23, Shaffner told defendant's agent Sheldon that no one was living in the house "because we weren't staying there overnight."

Donnie Murray testified that during February, March, and April 1991, he was on the acreage surrounding the house every day and sometimes twice a day. Murray said, "I kept an eye on the house, we always watched for the door open.... If I saw anything out of the ordinary I would notify Shaffner."

Rhonda Weaver testified that she and her husband did not pay any rent for the month of April, but that the cleaning and wallpapering which they did "was to be taken off the rent." She said at the date of the fire she had a key to the house but that she and her husband were spending the night at another location which they rented until May 1 and where they had most of their belongings. She said, "We had the right to move in the house as of the first of April, as soon as we got it the way we wanted it, nice and clean and liveable.... We were going to move all our belongings in and start spending the nights in the house after we had the electricity turned on. It was to be turned on on the 23rd.... We had not moved any furniture in the house except for cleaning supplies and something to have a snack, and a crate to stand on and an old table to put the plywood on to do the papering with. The old table probably would have been moved out.... We had not moved any of our clothes in yet."

Charles Sheldon, defendant's agent who sold the policy to plaintiffs, testified: "It is customary in the use of rental property that after one tenant moves out, the owner will need to go back in the premises and do some clean-up or redecorating. They had 60 days to do it."

Defendant argues that for a period of more than 60 days preceding the fire, the house, as a matter of law, was "vacant" or "unoccupied." In support of its argument, defendant relies upon the definition of the word "vacant" set forth in *Alcock v. Farmers Mut. Fire Ins. Co.*, 591 S.W.2d 126 (Mo.App.1979), which involved a policy exclusion containing the same language as the "Standard Provision" in the instant policy. In *Alcock* the court said, at 128:

> The term "vacant" means empty, without inanimate objects, deprived of contents. A thing is vacant when there is nothing in it. "Vacant" means abandoned and not used for any purpose. *Limbaugh v. Columbia Insurance Company of New York*, 368 S.W.2d 921 (Mo. App.1963); *Bledsoe v. Farm Bureau Mutual Insurance Company*, 341

S.W.2d 626 (Mo.App.1960); *Drummond v. Hartford Fire Insurance Company,* [343 S.W.2d 84 (Mo.App.1960)].

Immediately following the foregoing language, the court said in *Alcock:*

> The term "occupancy" refers to human habitation. A building is unoccupied when it is no longer a place of abode. *Florea v. Iowa State Insurance Company,* 225 Mo.App. 49, 32 S.W.2d 111 (1930). Occupancy refers to use of property as a customary and usual place of habitation to which return is contemplated after temporary absence. *Bledsoe v. Farm Bureau Mutual Insurance Company, supra.*[1]

Defendant does not quote or rely on the foregoing definition of the term "unoccupancy." Instead, defendant quotes the following language from *Cook v. The Continental Insurance Company,* 70 Mo. 610, 612 (1879), consisting of statements contained in cases from New York and Massachusetts: "Occupation of a dwelling house is living in it.... Occupancy, as applied to [a dwelling house] implies an actual use of the house as a dwelling place.... [O]ccupation of a dwelling house is living in it, not mere supervision over it, and while a person need not live in it every moment, there must not be a cessation of occupancy for any considerable portion of time."

The flaw in defendant's argument is that the instant policy contains its own definition of "vacant" and "unoccupied." Those definitions are in a vandalism and malicious mischief endorsement which was added to the policy on November 7, 1990. The endorsement contains an exclusion if the dwelling house "had been vacant or unoccupied beyond a period of thirty (30) consecutive days immediately preceding the loss."

Significantly, the endorsement contains the following definitions: "The term vacant as used in this endorsement shall mean containing no contents pertaining to operations or activities customary to occupancy of the building. The term unoccupied as used in this endorsement shall mean containing contents pertaining to occupancy of the building while operations or other customary activities are suspended."

■ Do the foregoing definitions of "vacant" and "unoccupied" contained in the endorsement apply to the same two terms when used in the "Standard Provision?" For the reasons which follow, this court answers the question in the affirmative. This court also holds that the record does not show, as a matter of law, that the dwelling house was either "vacant" or "unoccupied," as those terms are defined in this policy and used in the Standard Provision.

■ The law of contracts applies to an insurance policy and any claim or suit by either party must be based on the policy issued. *Bartleman v. Humphrey,* 441 S.W.2d 335, 342[1] (Mo.1969). The policy should be construed as a whole. *Dieckman v. Moran,* 414 S.W.2d 320, 321[2] (Mo. 1967). In determining the intention of the parties to an insurance contract, the entire policy and not detached provisions or clauses must be considered. *Doty v. American National Ins. Co.,* 350 Mo. 192, 165 S.W.2d 862, 869[23] (1942). If the language of an insurance contract is clear and unambiguous, the court does not have the power to rewrite the contract for the parties and must construe the contract as written. *Madison Block Pharmacy, Inc. v. U.S. Fidelity & Guaranty Co.,* 620 S.W.2d 343, 346[4] (Mo. banc 1981). The court's function is to construe, not make, insurance contracts. *Central Surety & Ins. Corp. v. New Amsterdam Cas. Co.,* 359 Mo. 430, 222 S.W.2d 76, 80[5] (1949).

In *Meyer Jewelry Co. v. General Insurance Co. of America,* 422 S.W.2d 617 (Mo. 1968), the court said, at 623:

> "We follow a construction favorable to the insured wherever the language of a policy is susceptible of two meanings, one favorable to the insured, the other to

**1.** See, generally, 47 A.L.R.3d 398 (What constitutes "vacant or unoccupied" dwelling within exclusionary provision of fire insurance policy.) § 25 contains cases dealing with "preparation of premises for occupancy."

the insurer. Provisions restricting coverage are particularly construed most strongly against the insurer.... [A]n insurance policy being a contract designed to furnish protection will, if reasonably possible, be interpreted so as to accomplish that object and not to defeat it, and, if terms of the contract are susceptible of two possible interpretations and there is room for construction, the provisions limiting or cutting down on the coverage of the policy, or avoiding liability therefor, will be construed most strongly against the insurer."

In *Maupin v. Southern Surety Co.*, 205 Mo.App. 81, 220 S.W. 20 (1920), the court said, 220 S.W. at 21:

"The contract must be construed as a whole, and when a clause in the policy stands with others its sense may be gathered from those clauses which precede and those which follow. When words are used in one sense in one part of a contract, and such words are again used in the same contract, they are as a general rule deemed to have been used in the same sense as in the first instance; nothing to the contrary appearing. Of the construction of contracts in general, no one challenges the rule that all parts must be considered together, if possible." (Citing authorities.)

"Nothing to the contrary appearing, the same words used in different clauses will be understood to have been used in the same sense." 44 C.J.S. Insurance § 294, p. 1161. "Where the same words are used in different clauses of the insurance contract, they will ordinarily be understood to have been used in the same sense." 43 Am. Jur.2d Insurance § 280. "An expression to which a plain meaning is attached in one part of an instrument is held to have the same meaning in other parts of the same instrument, unless a contrary purpose plainly appears." Couch on Insurance 2d (Rev Ed) § 15:19.

"It is well accepted that ... definitions contained within the Policy are controlling. This is particularly true when an insurance policy defines terms in a manner which differs from the ordinary understanding of the terms." *Alpine State Bank v. Ohio Casualty Insurance Company*, 941 F.2d 554, 560 (7th Cir.1991). "When an insurance policy defines a term, that definition provides 'the meaning which must be given to that term ... unless the context clearly requires otherwise.'" *Id.* at n. 10. Where a term is defined in the policy, the court is bound by the policy definition. *Enterprise Tools, Inc. v. Export–Import Bank*, 799 F.2d 437, 439[3] (8th Cir.1986). "In the construction of insurance policies, it is a general rule that absent language to the contrary, a word or phrase in one part is presumed to have the same meaning when it is used in another part of a policy." *Hartford Accident & Ind. Co. v. Case Foundation Co.*, 10 Ill. App.3d 115, 294 N.E.2d 7, 13[10] (1973). See also: *Wachovia Bank & T. Co., v. Westchester Fire Ins. Co.*, 276 N.C. 348, 172 S.E.2d 518, 522[7] (1970); *Schweigert v. Beneficial Standard Life Ins. Co.*, 204 Or. 294, 282 P.2d 621, 626[5] (1955); *Peerless Dyeing v. Ind. Risk Insurers*, 392 Pa.Super. 434, 573 A.2d 541, 544[2] (1990); *Holter v. National Union F. Ins. Co. of Pittsburgh, Pa.*, 1 Wash.App. 46, 459 P.2d 61, 64[5, 6] (1969).

The endorsement contains this language: "Nothing contained herein shall vary, alter, or extend any of the provisions of this policy except as provided in this endorsement." By applying the definitions contained in the endorsement to the same words in the Standard Provision, this court does not "vary, alter, or extend any of the provisions of the policy except as provided in this endorsement."

If the definitions contained in the endorsement did not apply to the Standard Provision, "vacant" and "unoccupied" would mean one thing in one portion of the policy and something else in another portion. This court rejects that construction. The policy does not state that the definitions in the endorsement do not apply elsewhere in the policy.

Note that the policy definitions of "vacant" and "unoccupied" are mutually exclusive. One requires "containing no con-

tents" and the other requires "containing contents." Contrast that with the following statement contained in *Alcock, supra,* 591 S.W.2d at 129: "On the authorities previously cited, it must be concluded that a vacant building is by definition unoccupied."

■ On the date of the fire, the dwelling house was not "vacant." In order for it to be "vacant," it was necessary that it contain "no contents pertaining to operations or activities customary to occupancy of the building." Among its contents were the Warm Morning stove, the antique incubator, and a chair. These were contents pertaining to activities customary to occupancy of the building.

■ On the date of the fire, the dwelling house was not "unoccupied." To be "unoccupied," it was necessary that the dwelling house contain "contents pertaining to occupancy of the building while operations or other customary activities are suspended." It did contain contents pertaining to occupancy of the building, the same items just mentioned. However, it cannot be said that, as a matter of law, those contents were contained "while operations or other customary activities are suspended."

Agent Sheldon testified: "It is customary in the use of rental property that after one tenant moves out the owner will need to go back in the premises and do some clean-up or redecorating. They had 60 days to do it." Such activities were taking place almost daily between April 2 and April 21, when Shaffner and Mr. and Mrs. Weaver were cleaning, redecorating, and making repairs to the dwelling house. These activities included washing windows, a commonplace operation during normal occupancy. The trial court did not err in denying defendant's motion for a directed verdict.

■ Vacancy or unoccupancy were affirmative defenses. Defendant offered no instruction containing the definition of those two terms as set forth in the policy. There was no evidence that the dwelling house was vacant, whether the policy defi-

nition or the case law definition is used. The two refused instructions offered by defendant, Instruction A and Instruction B, each submitted, in the alternative, the issue of vacancy and the issue of unoccupancy.

■ Where affirmative defenses are submitted in the disjunctive, there must be evidence to support all submissions. *Berra v. Union Elec. Company,* 803 S.W.2d 188, 190[1] (Mo.App.1991); *Brown v. Shawneetown Feed & Seed Co.,* 730 S.W.2d 587, 589[1] (Mo.App.1987); *Stanfill v. City of Richmond Heights,* 605 S.W.2d 501, 502[3] (Mo.App.1980). Since there was no evidence of vacancy, neither Instruction A nor Instruction B was supported by the evidence, and each was properly refused.

Defendant does not challenge the correctness of Instruction 5, which was plaintiffs' verdict-director. Instruction 6, which was not submitted by plaintiffs but was given by the court, submitted defendant's affirmative defense. Defendant challenges Instruction 6 on two grounds: (a) It erroneously contained a definition of the terms "vacant" and "unoccupied," and (b) it contained an erroneous definition of the term "unoccupied."

In support of ground (a), defendant argues: "If the terms are not defined in the policy, then those terms should not be defined in the instruction. In the instant case, no definitions of those terms were contained in the policy provisions relating to a fire loss." The argument is factually unfounded. Earlier in this opinion this court held that the definitions contained in the endorsement applied to the terms as used in the Standard Provision. It should be pointed out that refused Instruction B, offered by defendant, contained definitions, based on case law, of the terms.

■ In support of ground (b), defendant says that the definition of the term "unoccupied" which the instruction contained is erroneous because it did not fit the definition set forth in *Cook v. The Continental Insurance Company,* 70 Mo. 610 (1879), discussed earlier. "[G]enerally, a party may not complain of the court's failure to give an instruction not properly

requested." *Howard Const. Co. v. Teddy Woods Const. Co.*, 817 S.W.2d 556, 562[9] (Mo.App.1991). See also *Sullivan v. KSD/ KSD–TV,* 661 S.W.2d 49, 51[4] (Mo.App. 1983). "A party who believes that additional instructions are legally appropriate must request a correct instruction and must develop an evidentiary record in support." *Hagen v. Celotex Corp.,* 816 S.W.2d 667, 674[8] (Mo. banc 1991).

The definition of "unoccupied" which should have been given was that contained in the policy. It was incumbent upon defendant to offer such an instruction containing that definition, and defendant did not do so. It is unnecessary to determine whether such an instruction, if offered, would have been supported by the evidence.

The judgment is affirmed.

MONTGOMERY, P.J., and GARRISON, J., concur.