**Earl J. KENNEDY, Jr. and Continental Boiler Works, Inc., a Missouri Corp., Appellants,**

v.

**Robert FOURNIE, Sr., et al., and Boatmen's National Bank of St. Louis, N.A., Respondents.**

No. 66154.

Missouri Court of Appeals,
Eastern District,
Division Five.

March 31, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 2, 1995.

Application to Transfer Denied
June 20, 1995.

Gregory H. Wolk, St. Louis, for appellants.

Joseph E. Martineau, St. Louis, for respondents.

CARL R. GAERTNER, Judge.

Plaintiff Continental Boiler Works, Inc. (Continental) appeals from the trial court's grant of summary judgment in favor of defendant Boatmen's National Bank of St. Louis (Boatmen's) on a claim for conversion of personal property and from the trial court's judgment, granting judgment notwithstanding the verdict in favor of Boatmen's on Continental's claim for damages due to a commercially unreasonable sale of machinery and inventory and alternatively

granting a new trial on Continental's claim for damages due to a commercially unreasonable sale of machinery and inventory after finding that the jury's verdict in favor of Continental on this claim was against the manifest weight of the evidence. We affirm.

Continental is a Missouri corporation engaged in the fabrication of custom steel and alloy plates. In 1987, when the incidents occurred which gave rise to the underlying action, Robert G. Fournie, Sr., was the president and chief executive officer of Continental, and his family owned 50 percent of the Continental's voting stock. Also at this time, Earle J. Kennedy, Jr., was a member of Continental's board of directors, and his family owned the remaining 50 percent of Continental's voting stock. Since 1984, however, Fournie and Kennedy had been feuding. By 1987, they were not on speaking terms and would not sit together in the same room.

Continental operated a manufacturing facility on West Park Avenue in St. Louis. On August 5, 1985, Boatmen's entered into two security agreements with Continental to secure the payment of various notes.[1] In the first agreement, a First Deed of Trust and Security Agreement, Continental granted Boatmen's a security interest in the real estate upon which its manufacturing facility was located and "all buildings, improvements, and fixtures now or hereafter existing upon such real estate...." Continental also granted Boatmen's a security interest in "all accessories, parts and assessions (sic) attached to" its manufacturing site. In the second agreement, a Machine and Equipment Security Agreement, Continental granted Boatmen's a security interest in all of its "equipment, machinery, appliances, furnaces, air-conditioning apparatus," inventory and accounts.

At the time that the parties entered into these security agreements, Continental was in default on loan obligations to Boatmen's, owing the bank more than $4 million. By 1987, Continental reduced its indebtedness.

However, the debt increased by $350,000.00 in June 1987.

In 1986, the Fournies began expressing to Boatmen's their interest in purchasing Continental's real estate and personal property in a private sale. Boatmen's notified Kennedy of its discussions with the Fournies, and Kennedy expressed no interest in purchasing Continental's assets. By July 1987, negotiations between the Fournies and Boatmen's broke down, and Boatmen's decided to foreclose on Continental's assets due to Continental's default on its loan obligations. Boatmen's scheduled a complete sale of Continental's assets for September 1, 1987. Kennedy objected to this procedure, prompting Boatmen's to cancel the sale.

On September 11, 1987, Boatmen's recommenced foreclosure proceedings, issuing to Continental notice of its scheduled October 2, 1987, foreclosure sale of Continental's real estate and "other personal property situated thereon" pursuant to the parties' First Deed of Trust and Security Agreement. On September 28, 1987, Boatmen's notified Continental of its scheduled October 6, 1987, public auction sale of Continental's inventory, machinery, equipment and appliances pursuant to the parties' Machine and Equipment Security Agreement.

At the October 2, 1987, real estate foreclosure sale, the trustee orally announced that the overhead bridge cranes and the stress-relieving furnace located on Continental's property would be included in the sale. The overhead bridge cranes ranged from 30 to 50 feet in width and rode on rails which were permanently affixed to the structural support beams of Continental's manufacturing plant and were powered by electricity. The stress-relieving furnace was a freestanding steel structure, measuring 17 feet by 17 feet by 50 feet. The furnace was bolted to a concrete foundation and was constructed and installed in panels. It had a railroad car bottom which weighed approximately 100,000 pounds and was attached to railroad tracks. For $601,000.00, Boatmen's sold Continen-

1. Centerre Bank actually entered into these agreements with Continental. However, in 1989, Boatmen's Bank was merged into Centerre, and the surviving entity changed its name to Boatmen's. Throughout this opinion, therefore, we will refer to Centerre and Boatmen's collectively as Boatmen's.

tal's real estate, cranes and furnace at the October 2, 1987, sale to Continental Fabricators, a corporation formed by two former Continental officers, Robert and Thomas Fournie. The proceeds of the sale were applied to Continental's debt, leaving a balance due of $688,431.62.

Boatmen's hired A–Tec Liquidations, Inc., to assist in the October 6, 1987, public auction of Continental's remaining personal property. Concerned about gaining access to Continental's plant to enable A–Tec to inspect Continental's property to provide a commercially reasonable sale, Boatmen's obtained an easement and license agreement from Continental which gave Boatmen's and its designees an irrevocable right of access to the premises "for the purpose of preparing and conducting an auction of certain personal property. . . ." Prior to the October 2, 1987, real estate sale, Continental permitted Boatmen's and A–Tec to use the bridge cranes to move inventory in anticipation of the October 6, 1987, sale. However, after the real estate sale and just prior to the public auction, Continental Fabricators informed Boatmen's that it could not use the overhead cranes during the auction unless Boatmen's obtained sufficient insurance and made a rental payment. Instead of meeting these requirements, the auctioneer obtained a portable crane and forklift and provided riggers to assist in removing purchased items. The auctioneer also announced at the start of the auction that the bridge cranes could not be used to remove purchased items, that removal of items would be the buyer's obligation, and he told several people that a portable crane was available to assist in removing purchased items.

Prior to the public auction, A–Tec mailed brochures concerning the auction to approximately 3,500 prospective bidders, and it published advertisements for the auction in the St. Louis Post–Dispatch and the Chicago Tribune. In these notices, A–Tec identified the items to be sold, the date, time and location of the auction, the terms of the

inspection period and the terms of the sale. Additionally, A–Tec included the following statement in the brochures and advertisements: "The property is being sold as is, where is, without any warranties either implied or expressed."

Prior to the auction, Boatmen's and A–Tec also requested that Continental produce mill test reports for the sheets of steel in Continental's inventory which Boatmen's planned to sell.[2] Continental, however, failed to provide these reports, which were located in Continental's office, an area not subject to Boatmen's security agreements.

The October 6, 1987, public auction lasted all day. Four A–Tec employees moved items, and three of its employees auctioned the assets. One hundred and thirty-five bidders attended the auction. No one was prevented from bidding, and items were only sold to the highest bidder. The sale grossed $491,905.47. Boatmen's subsequently collected Continental's accounts receivable, totaling $307,353.00. Continental's indebtedness to Boatmen's was retired in December 1987.

Earle Kennedy and Continental filed an eleven-count petition against Fournie, his family members, Continental Fabricators and Boatmen's. Among its allegations, plaintiffs claimed that Boatmen's converted the overhead bridge cranes and stress-relieving furnace at the October 2 foreclosure sale by selling them as part of Continental's real estate instead of selling them at the October 6 collateral sale. Plaintiffs further alleged that pursuant to § 9–507 of the Uniform Commercial Code (U.C.C.) Boatmen's conducted a commercially unreasonable sale on October 6, 1987, in selling Continental's personalty at public auction because the auctioneer advised purchasers that the overhead cranes could not be used for removal of inventory and equipment purchased and the auctioneer failed to provide steel mill test reports to interested parties at the auction.

---

**2.** Continental's inventory of steel sheets included steel pressure vessels which must be certified according to standards established by the American Society of Mechanical Engineers (ASME). As an ASME certified fabricator, Continental was required to maintain records, known as steel mill reports, regarding the quality and character of the steel used to manufacture its steel pressure vessels.

On June 29, 1993, Boatmen's moved for partial summary judgment on several of plaintiffs' counts, including their conversion claim. On November 5, 1993, Judge Robert Dierker issued an order granting Boatmen's motion. Despite a later amendment to the order, summary judgment was still granted in favor of Boatmen's on the conversion claim. Trial of the remaining issues, many of which dealt with Continental's claims against Continental Fabricators and its officers and a counterclaim filed by Robert and Thomas Fournie against members of the Kennedy family, commenced on January 24, 1994. On February 11, 1994, the jury returned verdicts in favor of Continental on a number of its counts relating to various members of the Fournie family, Continental Fabricators and some of its officers. On its count alleging that Boatmen's conducted a commercially unreasonable sale on October 6, 1987, the jury returned a verdict for $250,000.00 against Boatmen's.

Both Continental and Boatmen's filed motions for judgment notwithstanding the verdict or in the alternative for a new trial. In its motion, Boatmen's contended it was entitled to judgment notwithstanding the verdict because Continental failed to establish a prima facie case that the October 6 auction was a commercially unreasonable sale, it failed to prove that any damages resulted from a commercially unreasonable sale, and Continental was estopped from claiming the sale was commercially unreasonable. Boatmen's additionally claimed it was entitled to a new trial because the verdict was against the manifest weight of the evidence and the result of several alleged instructional and evidentiary errors and the passion and prejudice aroused by improper closing argument by Continental. The trial court sustained Boatmen's motion, granting it judgment notwithstanding the verdict and alternatively a new trial. This appeal followed.[3]

### I.

Continental's first two points of appeal attack the trial court's grant of partial summary judgment. The trial court granted partial summary judgment as to count VI and a portion of count VII of Continental's petition. Both count VI and count VII are based on the notice Continental received regarding the sale of the bridge cranes and the stress-relieving furnace. Continental alleges the notice it received of the real estate foreclosure sale set for October 2, 1987, did not extend to the cranes and furnace. Instead, Continental argues, these items should have been sold at the October 6 sale under the machine and equipment security agreement. In count VI of its petition, Continental alleges this sale without notice constituted a tortious conversion. In count VII of its petition, Continental maintains that the sale of the cranes and stress-relieving furnace violated the U.C.C.'s notice requirements. Furthermore, count VII avers, by violating the U.C.C.'s notice requirements, Boatmen's was barred from trying to collect any deficiency on Continental's debt and was thereby barred from holding the second sale. Count VII also sought damages alleging that the second sale was commercially unreasonable for reasons unrelated to the cranes and stress-relieving furnace.

Boatmen's moved for partial summary judgment. The trial court granted Boatmen's motion. The court determined that the cranes and stress-relieving furnace were fixtures and, thus, were properly sold with the real estate. As to count VI, the court also determined that an action for tortious conversion would not apply based on a lack of notice. As to count VII, the court reserved the issue of the commercial reasonableness of the second sale. The court did determine that Boatmen's did not violate the U.C.C.'s notice requirements regarding the cranes and stress-relieving furnace; therefore, Boatmen's could hold the second sale.

■ Continental's appeal from the summary judgment attacks the trial court's ruling only as it applies to the conversion claim. Continental does not allege any error with regard to the court's disposition on summary judgment of count VII, which dealt with the

---

**3.** On appeal, Boatmen's is the only remaining defendant. Continental has settled its claims with all other parties.

propriety of holding a second sale. Any errors applicable to count VII are therefore abandoned. Rule 84.13(a).

■ When considering an appeal from a summary judgment, our review is essentially *de novo;* the criteria for testing the propriety of summary judgment are no different on appeal than those used by the trial court initially. *ITT Commercial Finance v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). We view the record in the light most favorable to the non-moving party and accord the non-movant the benefit of all reasonable inferences. *Id.* Facts set forth in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. *Id.* Summary judgment is appropriate where there is no genuine dispute as to the facts and the facts as admitted show a legal right to judgment for the movant. *Id.* at 380.

In its first point, Continental argues that the trial court erred in granting summary judgment on Continental's conversion claim because the cranes and stress-relieving furnace were not fixtures; they were personal property covered under the machine and equipment security agreement. Continental argues that selling these items with the real estate amounted to a tortious conversion because Boatmen's did not notify Continental that these items would be sold at the October 2 foreclosure sale, instead of the October 6 sale. In its second point, Continental argues that even if the items are fixtures, they are governed by the U.C.C. *See* § 400.9–313 RSMo.1986. Specifically, Continental points to language in the First Deed of Trust and Security Agreement, which reads, "This Deed of Trust constitutes a 'security agreement' as that term is used in the Uniform Commercial Code." Continental maintains that this language displays an intent that fixtures covered under the Deed of Trust would be subject to U.C.C. remedies. In this event, Continental argues, Boatmen's still failed to give proper notice.

Both of Continental's arguments overlook the basic elements of conversion. In fact, nowhere in its brief does Continental set forth the elements of a tortious conversion.

The undisputed facts demonstrate that, whether or not the cranes and furnace were fixtures, Continental could not maintain an action for tortious conversion.

■ Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights. *Emerick v. Mutual Benefit Life Ins. Co.,* 756 S.W.2d 513, 523 (Mo. banc 1988). Conversion may be proved in one of three ways: (1) by showing a tortious taking, (2) a use or appropriation by the defendant indicating a claim or right in opposition to the owner, or (3) a refusal to give up possession on demand. *Emerick,* 756 S.W.2d at 525. Under any theory, Continental must show it had title to, or a right of property in, *and a right to the immediate possession of the property concerned at the alleged date of conversion. Jackson v. Premier Service Corp.,* 761 S.W.2d 648, 650 (Mo.1988).

■ Continental could not prevail under the first theory. There was no tortious taking. Continental was admittedly in default. Under either the Deed of Trust or the Machine and Equipment Security Agreement, Boatmen's had a right to take possession of the cranes and stress-relieving furnace. *See* § 400.9–503 RSMo.1986. Continental could not prevail under the second theory, either. Continental did not have any right to immediate possession at the alleged time of conversion. Generally a debtor has no immediate right to possession once an item has been properly repossessed by a secured creditor. *See Mickelson v. Airmen, Inc.,* 712 S.W.2d 714, 717 (Mo.App.1986).

■ The only possible theory under which Continental could recover for conversion is if Boatmen's failed to return the items on demand after Continental tendered its defaulted debt. When the initial taking is authorized, demand and refusal are necessary to the existence of a conversion claim. *Emerick,* 756 S.W.2d at 525. In other words, this theory of recovery is appropriate where the defendant rightfully assumes possession, but wrongfully retains possession. *Id.* However, it is undisputed that Continental made no attempt whatsoever to redeem its

property. If Continental had made such an attempt, it would have constituted a demand and refusal, supporting an action for tortious conversion. *See Owens v. Automobile Recovery Bureau, Inc.*, 544 S.W.2d 26 (Mo.App. 1976). Continental took no action.

 Assuming that notice was defective under the U.C.C., Continental would be allowed to pursue any U.C.C. remedy for the resulting commercially unreasonable sale. *Commerce Bank of St. Louis v. Dooling*, 875 S.W.2d 943, 947 (Mo.App.1994). Under the facts in the instant case, an action in conversion is not one of those remedies. Continental was in default. Boatmen's properly seized the cranes and furnace. Continental never made any demand for the return of these items. Since at the time of the alleged conversion Continental had no right to possession, Continental cannot maintain an action for tortious conversion. *See Gateway Aviation, Inc. v. Cessna Aircraft*, 577 S.W.2d 860, 861–62 (Mo.App.1978).

As a matter of law, Boatmen's was entitled to summary judgment on Continental's claim of conversion. Points one and two are denied.

### II.

In its third point, Continental contends the trial court erred in granting judgment N.O.V. in favor of Boatmen's on Continental's claim that Boatmen's conducted a commercially unreasonable sale of collateral at the October 6, 1987, public auction. Continental argues that the burden of proving the commercial reasonableness of the sale rested with Boatmen's which only offered oral testimony evidence on the issue, thereby precluding a verdict directed in its favor. Continental further argues that it presented a submissible case showing that the sale was commercially unreasonable, that it proved that it suffered damages due to the unreasonable sale, and that it was not estopped from claiming that the sale was commercially unreasonable.

 Our standard of review is well-settled. We must consider only the evidence and inferences in support of the verdict and disregard Boatmen's evidence except as it may support the verdict. *Kasal v. Freihaut*, 860 S.W.2d 24, 25 (Mo.App.1993). Removing a case from the jury is a drastic measure which may only be taken if in the exercise of fair and impartial judgment there is no room for reasonable minds to differ. *Southwestern Bell Yellow Pages v. Robbins*, 865 S.W.2d 361, 365 (Mo.App.1993). A jury's verdict may only be set aside if there is a complete lack of probative facts to support it. *Id* at 366.

### A. Burden of Proof

At the outset, we must address Continental's contention that Boatmen's had the burden of proving that the auction was a commercially reasonable sale pursuant to § 400.9–504 RSMo.1994.[4] Continental contends that the trial court erred in granting Boatmen's motion for judgment N.O.V. because Boatmen's had the burden of proving commercial reasonableness and it only offered oral testimony on the issue, precluding a verdict directed in its favor under *Shaffner v. Farmers Mut. Fire Ins. Co.*, 859 S.W.2d 902, 904 (Mo.App.1993).

Section 400.9–504 provides a secured party with the right upon default by the debtor to dispose of collateral that is subject to the parties' security agreement. In disposing of such collateral, "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." § 400.9–504(3). Section 400.9–507(1) provides that if the secured party disposes of such collateral without proceeding in accordance with any of the provisions set forth in Part 5 of U.C.C. Article 9, the secured transactions portion of the U.C.C., the debtor "has a right to recover from the secured party any loss caused by" the secured party's failure to comply with these provisions.

 Missouri law is replete with cases in which the creditor files an action seeking a

---

**4.** Unless otherwise noted, all statutory references hereafter will be to Missouri Revised Statutes 1994.

deficiency judgment after selling the secured collateral. In such cases, the creditor bears the burden of proving that the sale was commercially reasonable. *See Commercial Credit Equipment Corp. v. Parsons,* 820 S.W.2d 315, 322 (Mo.App.1991); *First Missouri Bank & Trust Co. v. Newman,* 680 S.W.2d 767, 769–70 (Mo.App.1984). However, Missouri law is silent on where the burden of proving commercial reasonableness rests in cases where the debtor initiates the action pursuant to § 400.9–507(1).

While there are no Missouri cases addressing the debtor's burden of proof in a direct action under § 400.9–507(1), a debtor clearly has the burden of proving a counterclaim under the same provision. *Commercial Credit Equipment v. Parsons,* 820 S.W.2d 315, 323 (Mo.App.1991). It therefore follows that the debtor similarly has the burden of proof in a direct action under § 400.9–507. This comports with the longstanding principle in Missouri and other jurisdictions that the burden of proof, of establishing the truth of a given proposition of fact essential to a cause of action, rests with the party who asserts the affirmative of the issue, unless the facts are peculiarly within the knowledge of the opposing party. *See Dycus v. Cross,* 869 S.W.2d 745, 749 (Mo. banc 1994); *Anchor Centre Partners v. Mercantile Bank,* 803 S.W.2d 23, 30 (Mo. banc 1991); 29 Am.Jur.2d, Evidence § 157–158. Point denied.

### B. Commercial Reasonableness

Continental claims the trial court erred in granting Boatmen's motion for judgment N.O.V. because Continental presented a submissible case showing that Boatmen's conducted the October 6, 1987, sale of collateral in a commercially unreasonable manner.

Substantial evidence is required to establish a submissible case and remove the case from the realm of speculation, conjecture and surmise. *Sheridan v. Sunset Pools of St. Louis,* 750 S.W.2d 639, 641 (Mo. App.1988); *Allison v. Sverdrup & Parcel & Assoc.,* 738 S.W.2d 440, 455 (Mo.App.1987). A scintilla of evidence is insufficient, and forced inferences should not be indulged. *Allison,* 738 S.W.2d at 455. If one or more

of the elements of a cause of action are not supported by substantial evidence, a motion for directed verdict and for judgment N.O.V. should be granted. *Scott v. Car City Motor Co., Inc.,* 847 S.W.2d 861, 864 (Mo.App.1992).

The U.C.C. does not define "commercial reasonableness" but gives the following guides. Section 400.9–504(3) requires that any disposition of collateral be commercially reasonable in the method, manner, time, place and terms. This provision further requires that the secured party provide the debtor reasonable notification of the time and place of any public sale. Continental does not challenge the reasonableness of the sale based on any of these provisions, but instead only contests the reasonableness of the price Boatmen's obtained for the collateral.

Insufficient price, in and of itself, is never satisfactory to challenge a creditor's disposition of collateral. § 400.9–507(2); *ITT Commercial Finance Corp. v. Mid–America Marine Supply,* 854 S.W.2d 371, 384 (Mo. banc 1993). The U.C.C., however, does not sanction unreasonably low prices; it instead encourages the secured party to obtain the best resale price in order to reduce the possibility and amount of any deficiency. *ITT Commercial Finance,* 854 S.W.2d at 322. Any price insufficiency "is a factor important, but not decisive, to commercial reasonableness." *Id.* In order to constitute evidence of commercial unreasonableness, a price insufficiency must be coupled with evidence showing that the secured party neglected the obligations of good faith, diligence, reasonableness and care under § 400.1–102(3) in disposing of the collateral. *Id.* at 323. Evidence that the secured party was scrupulous as to every procedure required by § 400.9–504(3) and was free from self-dealing indicates that the secured party met its duty to act in good faith. *Id.*

Continental presented evidence concerning the value of nine pieces of large equipment and its inventory of steel sheets which were sold at the October 6, 1987, auction. According to an appraisal prepared by Marshall & Stevens on November 19, 1984, the nine pieces of equipment had a value in use of over $800,000.00, an orderly liquidation value

of $445,000.00, and a forced liquidation value of $238,450.00.[5] Continental claims that this equipment had a fair market value of over $700,000.00 at the time of its disposition,[6] and Boatmen's should have obtained this price for the equipment. Boatmen's, however, sold the equipment for $134,500.00 to Continental Fabricators.

Continental also offered evidence that its August 28, 1987, inventory of steel had a fair market value of $345,194.00. Kennedy testified that the maximum amount of steel used from then until October 6, 1987, totaled $18,793.00. Thus, at the time of the auction, Continental's steel inventory had a fair market value of $326,401.00. Boatmen's, however, sold the inventory for $105,800.00.

 There is no dispute that a disparity exists between the price obtained for the collateral and its value, regardless of the method of valuation employed. This evidence alone, however, does not constitute a submissible case of a commercially unreasonable disposition of collateral. Continental further contends that Boatmen's failed, in bad faith and contrary to normal commercial practices, to provide the use of overhead bridge cranes and mill test reports at the auction, which accounted for the disparity between the price obtained for the collateral and its value. However, viewing the evidence in the light most favorable to the verdict, we are unable to find substantial evidence in the record to support this contention.

The record indicates that Boatmen's attempted to obtain insurance to operate the cranes at the auction and that it expected to use the cranes as late as the day prior to the auction. Continental argues that when the cranes suddenly became unavailable the day before the auction Boatmen's silently acquiesced to this arrangement, despite its

right under the easement and license agreement it reached with Continental Fabricators to use the fixtures in the plant to remove personal property from the premises. Continental further claims that Boatmen's indisputably wanted to and knew it should obtain the mill test reports to provide them to bidders at the auction, but it instead silently agreed to not having access to them.

Upon a careful examination of the easement and license agreement, we cannot find a provision granting Boatmen's the right to use the fixtures in the plant. It merely granted Boatmen's the right of access to the plant to prepare and conduct the auction. Furthermore, neither party presented any evidence indicating that Boatmen's agreed to these arrangements. Nevertheless, even assuming that Boatmen's silently acquiesced to these arrangements, the record is devoid of any evidence indicating that in doing so Boatmen's acted in bad faith.

In its brief, Continental asserts that it presented a "devastating case" by proving a "myriad of facts—'deals', threats, discussions with one bidder concerning items which would be sold—from which the jury could reasonably have found that Boatmen's colluded with Continental Fabricators and acted in bad faith." The only devastating aspect of Continental's case is the utter absence of evidentiary support for this extraordinary contention. In support, Continental only points to one event in which Boatmen's met with the Fournies' attorney on the day prior to the October 2, 1987 foreclosure sale to discuss the items to be included in that sale. Continental argues that because the attorney attended the meeting representing the Fournies' company, Continental Fabricators, a bidder and purchaser at the foreclosure sale, Boatmen's discussion with him constituted a naked restraint of trade. Continental cites no legal authority to support this assertion.

5. "Value in use" refers to the "value of assets in use as an integral part of an operating enterprise with consideration given to the age, condition and utility and the used market"; "orderly liquidation value" refers to the "price which a property will bring if exposed for sale in the open market with a reasonable time allowed to find a purchaser ... the seller being compelled to sell and the buyer being willing but not compelled to buy"; and "forced liquidation value" refers to

the "price which a property will bring if exposed for immediate sale in the open market ... the seller being compelled to sell and the buyer being willing but not compelled to buy."

6. According to the testimony of Roger Chantel, a machinery appraiser, the fair market value of the equipment was determined by reducing the value in use of the equipment by 12 percent.

Furthermore, Continental failed to present any evidence showing the substance of this discussion or linking it in any way to the October 6, 1987, auction. There is simply no evidence in the record showing that Boatmen's colluded with Continental Fabricators or that Boatmen's acted in bad faith in disposing of Continental's collateral.

Continental additionally argues the record contains evidence that Boatmen's failed to follow normal commercial practices in failing to provide the use of the cranes and reports at the auction. John Haffenreffer, Boatmen's loan officer in charge of Continental's account, testified that overhead cranes were available at the only auction he had ever attended involving the disposition of similar equipment. Continental presented the deposition testimony of Carl Goodwin, president of a steel manufacturing firm. Goodwin attended the October 6, 1987, auction and testified that the auctioneer's announcement that the overhead cranes would not be available for use by purchasers was "unusual." Regarding the mill test reports, Goodwin testified that the absence of such records affects the value of steel because "[i]f you have the mill test reports, the material is—can be used in more applications, therefore, the fact that you do have the mill test reports makes the material more valuable." Haffenreffer concurred, testifying that mill test reports affect the value of steel.

This evidence does not constitute substantial evidence that Boatmen's deviated from ordinary commercial practices. Concerning the bridge cranes, Haffenreffer only attended one sale similar to the October 6, 1987, auction, and the record is silent concerning the basis of Goodwin's opinion that the absence of overhead cranes at the sale was unusual. Concerning the mill test reports, this evidence merely indicates that mill test reports affect the value of steel, a proposition that is not in dispute. The cited evidence, however, fails to shed any light on whether these reports are commonly provided at public auctions of steel.

Continental did not offer substantial evidence indicating that Boatmen's failed in bad faith to provide the use of overhead cranes and mill test reports at the auction. Continental also failed to offer evidence showing that the absence of these items at the auction deviated from normal, accepted commercial practices in disposing of similar collateral. The trial court did not err in granting judgment N.O.V. in favor of Boatmen's on these grounds. Point denied.

In light of our determination of the submissibility of Continental's claim of commercial unreasonableness, we need not address the additional subpoints concerning the absence of proof of damages and estoppel. Furthermore, Continental's fourth, fifth and sixth points of appeal all address the issues of damages and the conditional grant of new trial on the claim of commercial unreasonableness. Given our decision above, these points are rendered moot.

The judgment of the trial court is affirmed.

GRIMM, C.J., and DOWD, J., concur.