# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-3828/03-3832

_____

General Electric Capital Corporation,   *
                                       *

          Appellant/Cross-Appellee,  *

                                       *   Appeals from the United

     v.                            *   States District Court for the

                                       *   Eastern District of Missouri.

Union Planters Bank, NA,         *

                                       *

          Appellee/Cross-Appellant.  *

_____

Submitted: September 16, 2004
Filed: May 31, 2005

_____

Before LOKEN, Chief Judge, BEAM, and SMITH, Circuit Judges.

_____

BEAM, Circuit Judge.

This diversity case involves a dispute between two creditors—General Electric Capital Corporation (GECC), the plaintiff, and Union Planters Bank (UPB), the defendant—about funds UPB received from their common debtor—Machinery, Inc. (Machinery). The district court granted GECC's motion for summary judgment on liability, and held a bench trial to determine damages. Ultimately, the court entered judgment against UPB for $62,818. GECC appeals the damages determination, and UPB cross-appeals the liability ruling. We affirm in part, reverse in part, and remand the case for further proceedings.

## I.    BACKGROUND

Machinery was in the business of renting, selling, and servicing aerial manlift equipment. Machinery financed the purchase of its manlift inventory with GECC, UPB, and various other lenders, and it gave those creditors security interests in the inventory they financed. UPB was also Machinery's lender on an operating note, secured by a blanket lien on all of Machinery's property, and it was Machinery's depository bank. In March 2000, GECC and UPB entered into a subordination agreement in which UPB subordinated its security interest in GECC-financed inventory to the interest of GECC, as well as its interest in "all cash, rents and non-cash proceeds" arising from that same property.

In April 2000, UPB and Machinery set up a cash management system. Under this system, Machinery maintained three demand deposit accounts with UPB: a parent account and two operating accounts. Machinery would deposit the funds it had collected from equipment rentals, sales, and service into the parent account and write checks on the operating accounts to cover expenses. Each day, when Machinery's checks were presented for payment, UPB would transfer funds from the parent account to the operating accounts to cover the checks. If the parent account balance was inadequate to cover the operating-account expenditures, a revolving line of credit covered the shortfall. And, if an excess existed in the parent account after the items drawn on the operating accounts were paid, UPB would automatically "sweep" the funds from Machinery's parent account to pay down the balance owing on the line of credit. In July 2000, Machinery established the $1,250,000 line of credit at issue in this case.[1]

---

[1] It appears that a prior line of credit enabled the cash management system to operate in the same manner from April until July.

From April 2000, Machinery deposited its revenue in the parent account without identifying which items of inventory, if any, generated the funds it was depositing. UPB swept funds from the parent account and provided funds to the operating accounts regularly and automatically. The system operated in this manner until the beginning of March 2001, when Machinery's affairs began to fall apart. Machinery fell into default with UPB, and UPB terminated the automatic feature of the cash management system. Ultimately, Machinery filed for bankruptcy on March 29, 2001.

GECC filed suit against UPB claiming that UPB wrongfully swept proceeds of GECC-financed inventory from Machinery's parent account in January, February and March 2001. GECC asserted causes of action for wrongful setoff, breach of the subordination agreement, conversion, tortious interference with contract, and unjust enrichment. GECC moved for partial summary judgment on its conversion claim, arguing that UPB converted funds in which GECC had a superior interest when UPB swept the account. UPB cross-moved for summary judgment on all of GECC's claims. The district court granted GECC's partial motion, holding that UPB was liable for conversion, but reserved the question of damages for trial. The court dismissed the remaining counts with prejudice because they all sought relief for the same injury.

Evidence of damages was presented at a bench trial. The district court concluded that UPB converted $62,818 of funds in which GECC had a superior interest when it swept Machinery's account in January, February, and March.

GECC appeals the damages ruling, and UPB cross-appeals the district court's entry of summary judgment on liability. The district court had jurisdiction under 28 U.S.C. § 1332, and we have appellate jurisdiction under 28 U.S.C. § 1291.

## II.    DISCUSSION

In diversity cases, we apply the substantive law of the state in which the district court sits.  Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).  Here, that is Missouri, and we review the district court's interpretation of Missouri law de novo.  Bass v. Gen. Motors Corp., 150 F.3d 842, 846-47 (8th Cir. 1998).

UPB appeals the  district court's grant of partial summary judgment to GECC on its conversion claim, and the district court's denial of its cross-motion for summary judgment on the same claim.  "We review a grant of summary judgment de novo and apply the same standards as the district court."  Bockelman v. MCI Worldcom, Inc., 403 F.3d 528, 531 (8th Cir. 2005).  "Summary judgment is warranted if the evidence, viewed in the light most favorable to the nonmoving party, shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law."  Id.

GECC appeals the district court's damages judgment.  "Rule 52(a) of the Federal Rules of Civil Procedure mandates that in cases tried to the court, findings of fact shall not be set aside unless clearly erroneous."  Adzick v. UNUM Life Ins. Co., 351 F.3d 883, 889 (8th Cir. 2003).

Under Missouri law,

[c]onversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights. Kennedy v. Fournie, 898 S.W.2d 672, 678 (Mo. App. 1995) . . . . [A] plaintiff must show title to, or a right of property in, and a right to the immediate possession of the property concerned at the alleged date of conversion.  Id.

Bell v. Lafont Auto Sales, 85 S.W.3d 50, 54 (Mo. Ct. App. 2002).

This case involves a conflict over funds generated by leases of inventory in which GECC held a security interest. Those proceeds were deposited in Machinery's parent account with UPB. This was typical of Machinery's operations and there is no evidence that GECC objected to the deposit of those funds in that account. GECC's conversion theory is based on what happened after those funds were deposited.

GECC claimed that UPB converted GECC's property when it swept funds from Machinery's parent account under the cash management system in January, February, and March 2001. GECC premised this claim on its security interest in the proceeds of GECC-financed inventory. Specifically, it sought to establish that it had a "right of property in, and a right to the immediate possession of," the funds UPB received. Id. Because GECC's rights were premised on its security interest, GECC had to prove that it had a security interest in the funds UPB received from the parent account. To do that, GECC was faced with two tasks. First, it had to prove that proceeds in which it held a security interest were deposited in Machinery's parent account. If GECC established that fact, then GECC's security interest in the funds that were deposited continued in the deposit account to the extent of the amount of such deposits. GECC's second task, then, was to prove that the funds UPB received through its sweeps were encumbered by GECC's security interest in the deposit account. We address these two aspects of GECC's claim in turn.

## A. GECC's Security Interest in Machinery's Deposits

The district court determined that GECC had a security interest in certain funds that were deposited by Machinery in its parent account. It made this determination at the bench trial, and its conclusion is a finding of fact.

GECC sought to establish its security interest in deposited funds by establishing that (1) ninety-two of Machinery's customers made lease payments to Machinery during January, February, and March 2001, (2) those customers leased

GECC-financed inventory, and (3) the funds paid by those customers were deposited in the parent account. The funds paid by a lessee of inventory are proceeds of that inventory under Missouri law, and GECC's security interest in the inventory therefore continued in those proceeds. Mo. Ann. Stat. § 400.9-306(1)-(2), cmt. 6.[2] But GECC's evidence was weak. Audit records indeed revealed that the ninety-two customers had leased GECC-financed inventory. And cancelled checks that had been deposited in Machinery's parent account established the amounts paid by the ninety-two customers to Machinery. But no leases, invoices, or other evidence tying the payments to the collateral was presented. GECC nonetheless argued that the audit records and cancelled checks showed that the funds paid by the ninety-two lessees and deposited in the parent account were proceeds of GECC-financed inventory because those customers were likely making payments on their leases of GECC-financed inventory.

UPB countered with testimony establishing that twenty-three of the ninety-two customers also leased equipment in which GECC had no security interest. The district court concluded that GECC had not proven that those twenty-three customers' payments were proceeds of GECC-financed inventory because the inference upon which GECC relied—that such customers were likely making payments on their leases of GECC-financed inventory—was no longer valid given UPB's evidence. The court therefore excluded those twenty-three customers' payments from its deposit calculations and held that GECC had proven that the remaining sixty-nine customers' payments were proceeds of GECC-financed inventory that was deposited in the parent account. We agree with the district court.[3] Including the twenty-three

[2]Unless otherwise indicated, all citations to Missouri's Uniform Commercial Code are to the 1997 version that applies in this case. Missouri adopted the revised version of Article 9, effective July 1, 2001. Mo. Ann. Stat. § 400.9-101 (West 2003). However, all events in question occurred before the revisions became effective.

[3]While we reject GECC's arguments to the contrary, one of its many arguments borders on frivolity. GECC argues that the district court clearly erred because GECC should be excused from presenting competent evidence on the issue—i.e., through

customers' payments requires speculation, and although GECC's evidence was scant, we see no clear error in the district court's finding with regard to the remaining sixty-nine customers' payments.

### B.    GECC's Security Interest in the Funds UPB Received

### 1.    Ordinary Course Payments: When To Use Equitable Tracing

GECC, however, did not object to the deposit of these funds.  Its conversion claim rests on UPB's sweeps.  So GECC had the burden of proving that the funds UPB swept were traceable to the funds deposited—funds in which it had a security interest.  See Bell, 85 S.W.3d at 54.  But proving that link is quite difficult, if not impossible, when funds from numerous sources are deposited and credited to a single account, from which the depositor makes withdrawals and orders payments. Equitable tracing principles ease this difficulty.  The question *how* such tracing works in this case is addressed below.  But because equitable tracing principles cannot be used unless equity calls for it, and because there are "good commercial reasons" for not using such principles to impose liability, we must initially "determine *when* [a court] should trace proceeds through a commingled account."  Harley-Davidson Motor Co. v. Bank of New England, 897 F.2d 611, 622 (1st Cir. 1990).

---

an analysis of Machinery's leases, accounts, invoices, and deposits.  According to GECC, "the record was clear that such an attempted reconstruction would have taken weeks of professional time and cost hundreds of thousands of dollars, something obviously unreasonable in this case, with less than $500,000 in controversy."  App. Reply Br. at 21 (citation to the record omitted). The amount of money at stake in litigation is relevant only to our diversity jurisdiction; it does not excuse a plaintiff from offering evidence that proves its claim.

One UCC provision has been used to delineate when a debtor's payee will be deemed a recipient of encumbered proceeds through the use of equitable tracing principles.  That provision provides the following:

> Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds.  What has been said relates to payments and transfers in ordinary course.  The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.

Mo. Ann. Stat. § 400.9-306, cmt. 2(c).

We agree with the district court that Missouri, like most other states confronted with this issue, would recognize this official comment as law.  The current version of Missouri's Uniform Commercial Code supports this result.  See Mo. Ann. Stat. § 400.9-332(b) (West 2003) (ending a security interest in a deposit account upon the transfer of funds "unless the transferee acts in collusion with the debtor in violating the rights of the secured party").  And we agree with those courts that have held that this comment effectively delineates those circumstances when tracing is appropriate: when the payee receives funds "out of ordinary course or otherwise in collusion with the debtor."  See, e.g., Harley-Davidson Motor Co., 897 F.2d at 622.  Here, the district court held that the subordination agreement meant that UPB, as a matter of law, did not receive the funds swept from the parent account in the ordinary course of Machinery's business.  We disagree.

In Orix Credit Alliance, Inc. v. Sovran Bank, 4 F.3d 1262 (4th Cir. 1993), the court was faced with a factually similar situation.  The depository bank and the debtor/depositor had set up a "cash collateral account" in which all of the debtor's

customers' payments were deposited. Routinely, and pursuant to an agreement, the balance of that account was applied to the depositor's line of credit with the depository bank. The transaction that gave rise to the lawsuit involved the depository bank's application of the balance of the deposit account to reduce the balance on the outstanding line of credit just after the proceeds of a crane had been deposited in the debtor's cash collateral account. Both the plaintiff—another lender—and the depository bank had a security interest in the crane and the generated proceeds that were deposited. The depository bank had subordinated its interest in the crane to the competing lender's interest in the crane. And the court assumed that the bank knew the proceeds of the crane had been deposited in the account. Id. at 1264-66 & n.7.

The court in Orix held that the depository bank took the funds free of the plaintiff's superior security interest under Official Comment 2(c). Id. at 1267-69. As to the plaintiff's claim that the depository bank knew that encumbered proceeds had been deposited, the court said, "[A] transferee's knowledge of a prior security interest in proceeds does not, by itself, indicate that the transfer of these proceeds occurred outside the ordinary course of the debtor's business." Id. at 1267. We agree with that statement and, like the court in Orix, we conclude that the phrase "in the ordinary course," means that the plaintiff must establish more than a defendant's knowledge of a superior security interest: It must establish either a lack of good faith or that the payee "knows . . . that the [payment] is in violation of some term in the security agreement not waived by the words or conduct of the secured party." Mo. Ann. Stat. § 400.9-307, cmt. 2; accord Orix, 4 F.3d at 1266-67; ITT Commercial Fin. Corp. v. Bank of the West, 166 F.3d 295, 307-08 (5th Cir. 1999) (collecting and discussing authorities).

GECC's claim is weaker than the plaintiff's claim in Orix. In Orix, the balance of the cash collateral account was applied only to the line of credit and there was some evidence that the depository bank knew that the deposit at issue contained proceeds. Thus, there was at least an inference (albeit an insufficient inference for

liability purposes) of the depository bank's knowledge that proceeds of a secured party's collateral had been deposited, and there was no question that the account balance was created by such funds. Here, there is no evidence that UPB knew that proceeds of GECC-financed inventory had been deposited. And, more importantly, there is no evidence that UPB knew that the account balance after all other expenses had been paid was created by such deposits. Even GECC's trial evidence shows that only about four or five percent of Machinery's $4 million in total deposits were proceeds of GECC-financed inventory, while UPB swept an amount that equaled 37.6% of the total deposits. UPB should not be charged with knowing that the remaining account balance was created by the small portion of proceeds of GECC-financed inventory that had been deposited.

If UPB did not know that the remaining account balance was traceable to the encumbered deposits, then as a matter of law it did not know that its sweeps violated the terms of GECC's security agreement with Machinery because it did not know GECC's interests were implicated. And even if UPB knew that proceeds of GECC-financed inventory had been deposited in the account and that the remaining balance had been created by the deposits, as in Orix, that knowledge is not enough. Given Machinery's apparent ability to deposit those funds and use the account to pay creditors, UPB surely did not know, and should not be expected to know, that its sweeps would violate a term in Machinery and GECC's security agreement that GECC had not waived.

The district court concluded that the subordination agreement "unlock[ed] the mystery to this case," holding UPB could not avoid liability by claiming it did not know that the funds it swept were encumbered by GECC's security interest. UPB argued that GECC should have required Machinery to segregate the lease payments on GECC-financed inventory from Machinery's other revenue, and that without such segregation, there was no way for UPB to know that it was being paid with proceeds of GECC-financed inventory. The court responded: "When . . . [UPB] gave up its

rights to whatever [GECC] had, it should have been the party responsible for making sure that it did not violate its contractual obligations." GECC takes this to mean that the district court held that the subordination agreement imposed upon UPB an implicit contractual duty to find and segregate any funds that were deposited in which GECC may claim a security interest, and that in the face of that duty, UPB could not claim a lack of knowledge. If that is what the district court meant, it erred. First, as explained below, UPB did not give up all of its rights. Second, we will not imply a duty to segregate a debtor's deposits. Sophisticated lenders like GECC and UPB are fully able to bargain for such duties, and they know the risks associated with allowing debtors to commingle funds in a single account that is used to pay various creditors in the ordinary course of the debtor's business.

Apparently, the district court concluded that the subordination agreement meant that UPB agreed that it would not accept payment from Machinery if the funds Machinery used were produced by leasing GECC-financed inventory. The terms of the subordination agreement, however, are not that broad. UPB claimed that the sweeps from the cash management system were the conduit through which Machinery paid UPB on the line of credit. GECC did not present any evidence to the contrary, and Machinery does not appear to have paid UPB on the line of credit in any other way. Thus, UPB sufficiently established that the sweeps were payments.

Therefore, the question becomes whether the subordination agreement barred UPB from accepting such payments in the ordinary course of business if they were traceable to funds in which GECC could have claimed an interest. It did not. While UPB limited its ability to look to its security to satisfy Machinery's indebtedness by subordinating its "security interest" to GECC's, it did not promise to forego Machinery's payment of the substantial debt that Machinery owed. The cases GECC cites do not support a contrary conclusion. In the Orix dissent, 4 F.3d at 1269-72, Chief Judge Ervin based his analysis on the bank's express subordination of "any interest," id. at 1271, it had in the crane and its proceeds, not simply the bank's

-11-

subordination of its security interest. In <u>Safeco Credit Co. v. U.S. Bancorp Leasing & Fin., Inc.</u>, 833 F. Supp. 833 (D. Or. 1993), the court based its conclusion on the bank's express subordination of "any security interest, lien, claim or right, now or hereafter asserted . . . with respect to the [loader] or the cash or non-cash proceeds of the [loader]." <u>Id.</u> at 834 (second and third alteration in original). And in <u>HCC Credit Corp. v. Spring Valley Bank & Trust</u>, 712 N.E.2d 952, 958 (Ind. 1999), the court was describing a situation in which a secondary lender subordinates its *debt* to the secured party or otherwise excludes "the debtor's obligations to the secured lender in computing the debtor's borrowing base." All are inapposite.

At most, the subordination agreement in this case ensured that UPB was a junior secured creditor[4] and firmly established that UPB knew of GECC's security interest in some of Machinery's inventory and its proceeds. But even a junior secured creditor that knows of its junior status can be paid in the ordinary course of business. GECC had to show more. <u>See, e.g.</u>, <u>Anderson, Clayton & Co. v. First Am. Bank of Erick</u>, 614 P.2d 1091, 1095 (Okla. 1980) (holding that notice of the superior security interest provided by subordination agreement, depository bank's knowledge of proceeds deposits, and depository bank's demand for payment on a note that was not yet due took the payment outside of the ordinary course).

We conclude the district court erred in holding that the payments from Machinery to UPB were not in the ordinary course of Machinery's business. We

_____

[4]The subordination agreement also does not clearly make UPB junior with regard to the funds at issue. For example, the language does not bind UPB to subordinate future security interests it may obtain in the property or its proceeds. The agreement was executed in March 2000, and GECC appears to claim that UPB subordinated the security interest it obtained the next month in conjunction with the line of credit. Also, despite an artful quotation by GECC— "cash . . . and non-cash proceeds," App. Reply Br. at 2 (alteration in original)—the phrase, "cash, rents and non-cash proceeds" from the subordination agreement does not use "cash" as an adjective to modify "proceeds." It appears as a noun, like "rents."

decline, however, to direct the district court to enter summary judgment in UPB's favor. The district court based its conclusion on the subordination agreement, and we have concluded that agreement does not carry the day. And while we have strong doubts as to whether any other evidence establishes the requisite wrongdoing for January and February, March is a closer question. In March, Machinery was in default on its obligation to UPB, GECC contacted UPB and demanded that UPB turn over all proceeds of GECC-financed inventory (albeit without mentioning the amount or any way of identifying particular proceeds), and UPB had taken a much more active role in Machinery's operations, requiring Machinery to justify its expenses to UPB and sweeping a larger percentage of deposited funds in that month than in either of the two preceding months. See Barber-Greene Co. v. Nat'l Bank of Minneapolis, 816 F.2d 1267, 1272 (8th Cir. 1987) (concluding that a depository bank's total control over the account from which payment was made took the transfer out of the ordinary-course language of Official Comment 2(c)). Because GECC may be able to prevail at trial, at least for the March sweeps, we vacate the district court's grant of summary judgment and remand the case for further proceedings.

## 2. How Equitable Tracing Works in this Case

As indicated, GECC may be able to establish that some of UPB's sweeps occurred outside of the ordinary course of business, enabling it to use equitable tracing principles to establish that the funds UPB received were identifiable proceeds of GECC-financed inventory. Because the district court ruled on how GECC may trace deposited funds to UPB's sweeps, and because the parties have briefed the issue, we address the matter.

When funds from multiple sources are deposited to the same account and subsequent payments are made from the account, it becomes difficult, if not impossible, to determine whether the subsequent payments are traceable to the initial deposits. Equity, though, can serve as a means of attributing rights in such a

-13-

commingled account by tracing the subsequent payments to particular deposits. And, as the district court held, Missouri law recognizes the use of equitable tracing principles to identify a secured party's interest in a commingled deposit account.

As an initial matter, we reject GECC's attempt to characterize the use of equitable tracing principles as a way of measuring damages. The measure of damages in a conversion action "is generally the fair market value of the property at the time and place of the conversion." Bell, 85 S.W.3d at 54. Equitable tracing, on the other hand, allows a plaintiff to establish that the credit created by the deposit of encumbered funds was used to make a payment or a withdrawal. While tracing is a "tool to permit the calculation of damages at the time of conversion," Meyer v. Norwest Bank Iowa, 112 F.3d 946, 951 (8th Cir. 1997), it is not a measure of damages. It is the primary means of demonstrating the plaintiff's rights, and therefore the defendant's liability, in cases involving commingled accounts. This case illustrates that premise. Without equitable tracing, GECC cannot make out a claim for conversion because it cannot establish that the funds allegedly converted were identifiable proceeds in which it had a security interest.

In its summary-judgment order, the district court held that the lowest intermediate balance rule could be applied to Machinery's parent account. But at the damages trial, it concluded that a pro-rata methodology based on the total deposits, withdrawals, and sweeps over the relevant period was more appropriate because the lowest intermediate balance rule yielded a result of zero. Under its pro-rata rationale, the district court concluded that GECC could recover 37.6% of the total GECC proceeds deposited because UPB swept 37.6% of the total deposits.

-14-

The parties have cited no Missouri cases utilizing a pro-rata tracing methodology like that employed in this case, and we have found none.[5] Thus, we conclude that the lowest intermediate balance rule is the only tracing method available in this litigation.

But the district court erred in concluding that a proper application of the lowest intermediate balance rule yielded a result of zero. Because UPB received the funds at different times over the course of the three months, and GECC's conversion claim is based on UPB's sweeps, the analysis must look to those transactions. "Under the lowest intermediate balance rule, it is assumed the traced proceeds are the last funds withdrawn from a contested account. Once the traced proceeds are withdrawn, however, they are treated as lost, even though subsequent deposits are made into the account." Id. at 951 (citation omitted). The district court concluded that because the account was zeroed out by UPB sweeps and other payments, the traced proceeds were therefore gone. That conclusion would be appropriate if GECC's claim were based on the account balance *after* UPB swept the account. But GECC's claim is based on UPB's sweeps. Thus, Machinery's account balance *at the time* UPB swept it is the relevant account balance. By the very occurrence of the sweep, we know the balance of the account was not zero at that time. An appropriate application of the lowest intermediate balance rule would therefore focus on attributing the account balance at that time to preceding deposits of GECC proceeds.

Of course, a zero balance in the parent account after a deposit of GECC proceeds but before a UPB sweep would mean all of the credit that resulted from the deposit of GECC proceeds had been exhausted and, thus, lost. So the time frame the court must look to ends with a UPB sweep and begins with the immediately preceding

---

[5]In fact, the only precedent we have found supporting the use of pro-rata reasoning in a case like this required that the lowest intermediate balance be divided pro rata. See Bombardier Capital, Inc. v. Key Bank of Maine, 639 A.2d 1065, 1067 (Me. 1994).

-15-

zero balance. If GECC proceeds were deposited after the immediately preceding zero balance, they may be traced to UPB's sweep through an ordinary application of the lowest intermediate balance rule. Thus, the funds UPB swept on a given day will be deemed identifiable proceeds of GECC-encumbered deposits to the extent post-deposit withdrawals that precede the sweep didn't reduce the account balance below the amount of those encumbered deposits.

A hypothetical explains this proposition. If UPB swept the account on March 16 and received $20,000, then the court should look back to the immediately preceding zero balance. If that event occurred on March 15 (either through a transfer to the operating accounts or a previous UPB sweep), the court begins its application of the lowest intermediate balance rule there. After the preceding zero balance, assume that (1) $10,000 in GECC proceeds were deposited, (2) then $50,000 of other funds were deposited, (3) then $55,000 were transferred to the operating accounts to cover expenses, and (4) then $15,000 of other funds were deposited. The following chart represents the deposits, withdrawals, and account balances during the relevant time frame.

| GECC Proceeds Deposits | Other Deposits | Withdrawals | Account Balance |
|---|---|---|---|
| $10,000 | | | $10,000 |
| | $50,000 | | $60,000 |
| | | ($55,000) | $5,000 |
| | $15,000 | | $20,000 |

On these facts, GECC would be able to trace $5,000 of deposited proceeds in which it had a security interest, through the account, to the funds UPB received. Its other $5,000 interest in the account would be lost because after the $10,000 of GECC

-16-

proceeds were deposited, the account balance dropped to $5,000 when $55,000 were transferred to the operating accounts. The subsequent deposit of $15,000 did not replenish GECC's interest in the account.

We recognize that the facts upon which this analysis must proceed could be difficult to establish. But that problem does not entitle a plaintiff to recover on a conversion claim without establishing what property was converted.

## III.   CONCLUSION

We conclude the district court did not clearly err in holding that payments from sixty-nine of Machinery's customers were funds in which GECC had a security interest that were deposited in Machinery's parent account. However, we conclude the district court erred in holding that UPB had as a matter of law swept the parent account outside the ordinary course of Machinery's business. And we conclude that the district court erred in using its pro-rata tracing methodology. We therefore affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

———————————————