**In re MACHINERY, INC., Debtor.**

**General Electric Capital
Corp., Plaintiff,**

v.

**Union Planters Bank, N.A.,
& Machinery, Inc.,
Defendants.**

**Bankruptcy No. 01–43526–293.
Adversary No. 03–4623–293.**

United States Bankruptcy Court,
E.D. Missouri,
Eastern Division.

April 25, 2006.

Norman W. Pressman, Goldstein & Pressman, P.C., St. Louis, MO, for Debtor.

Jeffrey S. Heuer, Esq., Blackwell, Sanders, Peper Martin, St. Louis, MO, for Union Platners Bank.

Lance Gotthoffer, Michael Tsang, Reed Smith, New York, NY, for General Electric Capital Corporation.

Mark Goodman, Capes, Sokol, Goodman & Sarachan, St. Louis, MO, for General Electric Corporation.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

General Electric Capital Corporation ("GE Capital") filed this adversary complaint against Union Planters Bank ("Union Planters"). The parties' dispute centers on which entity's security interest had priority with respect to certain cash proceeds (the "Lift Proceeds") generated post-confirmation by Debtor, Machinery, Inc. ("Machinery"). Because Union Planters was a transferee of the Lift Proceeds, it took those proceeds free of GE Capital's superior security interest. The Court will accordingly enter judgment in favor of Union Planters.

## JURISDICTION AND VENUE

■■■■ This Court has jurisdiction over the parties and subject matter of this proceeding under 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 9.01(B) of the United States District Court for the Eastern District of Missouri.[1] This is a core proceeding under 28 U.S.C. § 157(b)(2)(K), which the Court may hear and determine. Venue is proper in this District under 28 U.S.C. § 1409(a).

## FACTUAL AND PROCEDURAL BACKGROUND

Machinery was in the business of leasing aerial lifts (the "Lifts") to end users for construction projects. GE Capital and Machinery entered into a floor plan financing and security agreement (the "GE Financing Agreement") in November, 1997. Under the terms of the GE Financing Agreement, GE Capital agreed to loan Machinery up to $5,000,000 to finance Machinery's purchase of the Lifts. Machinery executed a promissory note in favor of GE Capital in exchange for the loan and secured its obligation by granting GE Capital a security interest in the Lifts and all proceeds derived therefrom. GE Capital properly perfected its security interest.

---

1. The Court notes that although the disputed Lift Proceeds were generated post-confirmation, the Court must interpret its order confirming Machinery's plan of reorganization to determine which party had a superior interest in the Lift Proceeds. The Court, therefore, has subject matter over this adversary complaint pursuant to 28 U.S.C. § 157(b)(1). *United Taconite, LLC v. Minnesota (In re Eveleth Mines, LLC)*, 318 B.R. 682, 687 (8th Cir. BAP 2004).

Union Planters extended a line of credit to Machinery in March, 2000 to provide Machinery with working capital. Machinery executed a series of promissory notes in favor of Union Planters in exchange for the line of credit. Machinery secured its obligation under the promissory notes by granting Union Planters a security interest in specific items as well as a blanket lien on Machinery's inventory, accounts and proceeds from the inventory, which Union Planters perfected. (the "Union Planters Financing Agreement").

Contemporaneous with executing the Union Planters Financing Agreement, Union Planters executed a subordination agreement (the "Subordination Agreement") in favor of GE Capital. The Subordination Agreement provided that Union Planters' security interest in the Lifts and the proceeds therefrom was junior to GE Capital's security interest.

Machinery filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on March 29, 2001. Machinery filed its proposed plan of reorganization on July 27, 2001, and then an amended plan on August 28, 2001 (the "Amended Plan"). Sections 3.7 and 3.4.14.c of the Amended Plan gave Union Planters a senior security interest in Machinery's accounts receivables and cash. Section 3.7, however, also provided that any other secured creditor claiming a security interest senior to Union Planters in Machinery's cash proceeds could object to the general provisions of Section 3.7 on or before the hearing on confirmation of the Amended Plan.

GE Capital objected to confirmation of the Amended Plan, arguing that Section 3.7 of the Amended Plan improperly gave Union Planters a senior security interest in all of Machinery's post-confirmation cash proceeds. The Court held a hearing on the confirmation of the Amended Plan on October 3, 2001. At the hearing on confirmation, GE Capital withdrew its objection to the Amended Plan when Machinery and Union Planters both agreed that GE Capital would be deemed as having filed a valid objection under Section 3.7 of the Amended Plan.

The Court confirmed the Amended Plan in an order dated October 5, 2001. (the "Confirmation Order"). Paragraph (n)(3) of the Confirmation Order states that based on the compromise reached by Machinery, Union Planters and GE Capital, GE Capital was deemed to have filed a timely objection to the portion of Section 3.7 of Amended Plan giving Union Planters a senior lien on the proceeds of the Lifts.

Machinery defaulted on its obligation to its secured creditors, including GE Capital and Union Planters, under the Amended Plan sometime in late 2002. Machinery then notified its secured creditors in April, 2003 that it was ceasing operating as a going concern and would liquidate its assets.

Shortly after receiving Machinery's default notice, GE Capital requested that Union Planters remit the Lift Proceeds in its possession to GE Capital. Union Planters' attorney, in a letter dated April 28, 2003, stated that it would not remit the cash proceeds to GE Capital because under Section 3.7 of the Amended Plan, Union Planters possessed a superior lien in the Lift Proceeds.

GE Capital filed the instant adversary complaint in response to Union Planters' refusal to remit the Lift Proceeds to it. GE Capital's complaint contains three counts. Count I is a request for a declaration that GE Capital's security interest in the Lift Proceeds is superior to Union Planters' interest. GE Capital maintains in Count II that because Union Planters

took control of Lift Proceeds, the Court should order Union Planters to give an accounting of those proceeds. Finally, GE Capital asserts in Count III that Union Planters converted its property interest in the Lift Proceeds by failing to remit those proceeds to it upon demand.

Union Planters filed an answer to GE Capital's complaint, asserting that under Section 3.7 of the Amended Plan, it has a superior interest in all of Machinery's post-confirmation cash proceeds, including the Lift Proceeds. Specifically, Union Planters contends that because GE Capital failed to timely object to the priority of the liens established in Section 3.7 of the Amended Plan, it waived any right to challenge the superior interest that Section 3.7 gave to Union Planters.

Both parties filed motions for summary judgment on the issue of liability. The Court granted GE Capital's motion, finding that GE Capital retained the senior security interest in the Lift Proceeds. (the "Summary Judgment Order"). The Court specifically noted in the Summary Judgment Order that although Section 3.7 of the Amended Plan attempted to eviscerate GE Capital's senior Article 9 interest in the Lift Proceeds, GE Capital timely objected to that provision. Accordingly, the Court held that the Amended Plan did not alter GE Capital's senior Article 9 lien in the Lift Proceeds. The Court found in the Summary Judgment Order, therefore, that GE Capital had the senior security interest in the Lift Proceeds.

The Court then conducted a trial on the amount of damages, if any, GE Capital suffered as a result of Union Planters' conversion of GE Capital's senior security interest in the Lift Proceeds. The Court finds that the following facts were adduced at trial.

GE Capital did not require Machinery to segregate the Lift Proceeds from its other cash proceeds, although it did attempt to obtain post-confirmation reports from Machinery. Machinery, therefore, deposited the Lift Proceeds into its general account at Union Planters as required by Section 3.4.2(c) of the Amended Plan.

The evidence adduced at trial additionally demonstrates that Union Planters vigorously negotiated with Machinery in drafting the terms of the Amended Plan. And the evidence suggests that Machinery was amenable to Union Planters' request to draft the Amended Plan favorably with respect to Union Planters. For example, as indicated in the Summary Judgment Order, Machinery attempted to assert a provision in the plan that would rearrange the secured parties' Article 9 seniority with respect to Machinery's post-confirmation cash proceeds.

The evidence also demonstrates that Union Planters retained significant control over Machinery's operations post-confirmation. For example, Union Planters had the ability to approve Machinery's expenditures and to review and approve Machinery's budget post-confirmation. Union Planters further contacted ATEC to wind down Machinery's operation and liquidate its remaining assets.

The Court finds that this evidence established that the Lift Proceeds were cash proceeds of the Lifts. The evidence also demonstrates that Union Planters was a transferee of the Lift Proceeds. Additionally, the Court finds that although the evidence does support a finding that Union Planters exercised considerable control over Machinery's post-confirmation operation, it does not support a finding that Union Planters colluded with Machinery to violate GE Capital's rights in the Lift Proceeds. The Court finds, therefore, that Union Planters took the Lift Proceeds free from GE Capital's senior security interest

in those proceeds under Mo.Rev.Stat. § 400.9–332(a).

## CONCLUSIONS OF LAW

### A. Elements of GE Capital's Conversion Claim

The essence of GE Capital's claim is that Union Planters converted its senior security interest in the Lift Proceeds when Union Planters refused to remit those proceeds to it upon demand. The Court will apply Missouri's substantive law in determining whether Union Planters converted GE Capital's security interest in the Lift Proceeds. *Gen. Elec. Capital Corp. v. Union Planters Bank, N.A.,* 409 F.3d 1049, 1053 (8th Cir.2005).

Under Missouri law, conversion is the unauthorized assumption of the right of ownership in personal property to the exclusion of the true owner's rights in the property. *Bell v. Lafont Auto Sales,* 85 S.W.3d 50, 54 (Mo.Ct.App.2002). In the secured transaction context, a plaintiff secured creditor must prove that it had a superior right to immediately possess the collateral at issue. *MFA Inc. v. Pointer,* 869 S.W.2d 109, 111 (Mo.Ct.App.1993).

Here, the Court has already determined in the Summary Judgment Order that the Amended Plan could not alter GE Capital's Article 9 senior security interest in the Lift Proceeds. The question remains, however, whether Union Planters took the Lift Proceeds free of GE Capital's senior security interest when Machinery placed the cash proceeds in its general account at Union Planters. The Court finds that under Revised Article 9, because there is no evidence of collusion between Union Planters and Machinery, Union Planters took the Lift Proceeds free from GE Capital's senior security interest.

### B. Revised Article 9 governs the parties' respective rights in the Lift Proceeds.

GE Capital argues that the parties' respective rights in the Lift Proceeds are governed solely by the Amended Plan and not applicable state law, namely Article 9 of Missouri's version of the Uniform Commercial Code. There is no doubt that a confirmed plan of reorganization acts like a contract that binds the interested parties in the bankruptcy, including creditors who did not vote in favor of the plan. 11 U.S.C. § 1141(a); *Gen. Elec. Capital Corp. v. Dial Bus. Forms, Inc. (In re Dial Business Forms, Inc.),* 341 F.3d 738, 743–44 (8th Cir.2003). Also, the UCC allows the parties to vary their rights by agreement. Mo.Rev.Stat. § 400.1–102(3). The terms of a confirmed plan, therefore, may override the provisions of Article 9 and rearrange the parties' respective seniority. *Dial Bus. Forms,* 341 F.3d at 743 n. 3. Here, however, there is nothing in Amended Plan that altered the parties' respective pre-petition Article 9 rights in the Lift Proceeds.

Because the Amended Plan is essentially a contract, the Court will interpret the Amended Plan as any other contract. *Fieber's Dairy, Inc. v. Purina Mills,* 331 F.3d 584, 587 (8th Cir.2003). The Court will additionally apply applicable state law, in this case Missouri, in construing the terms of the Amended Plan. *UNR Indus., Inc. v. Bloomington Factory Workers,* 173 B.R. 149, 158 (N.D.Ill.1994).

Missouri law requires the Court to construe the terms of the Amended Plan as a whole and not in isolation. *Reese v. United States Fire Ins. Co.,* 173 S.W.3d 287, 299 (Mo.Ct.App.2005). Thus, the Court will read different provisions of the Amended Plan together when those provisions deal with the same issue. *Id.* Also, if two provisions arguably address the same issue, the provision that more specifically addresses the issue must gov-

ern. *A & L Holding Co. v. S. Pac. Bank,* 34 S.W.3d 415, 418–19 (Mo.Ct.App.2000).

GE Capital argues that the portion of Section 3.7 of the Amended Plan that recognizes the rights of the purchase money secured creditor's overrides the provisions of Article 9 with the respect to the Lift Proceeds. The Court disagrees.

Section 3.7 recites in relevant part that the Amended Plan is not "intended to grant UP Bank a security interest in equipment and inventory that is senior to that of a holder of a properly perfected purchase money security interest in such equipment and inventory". Section 3.7 also gives purchase money secured parties a senior security interest in proceeds stemming from the sale, but not the lease or rental, of any equipment. More importantly, as this Court has previously noted elsewhere, Section 3.4.13.b of Amended Plan recites that with respect to the secured creditors' rights in Machinery's post-confirmation assets, "all terms and conditions of the pre-petition documents executed by Machinery shall remain in full force and effect." *See JCB v. Union Planters Bank, N.A. (In re Machinery, Inc.),* 337 B.R. 368, 373 (Bankr.E.D.Mo. 2005).

The Court finds that the provisions of Section 3.7 of the Amended Plan, read as a whole, merely preserve the Article 9 senior security interest of the purchase money secured parties. As noted above, one provision of Section 3.7 of the Amended Plan did purport to give Union Planters a senior security interest in the Lift Proceeds despite GE Capital's superior Article 9 rights. As the Court noted in the Summary Judgment Order, however, that portion of Section 3.7 could not alter GE Capital's superior Article 9 rights in the

Lift Proceeds over GE Capital's timely objection.[2] Accordingly, there is nothing in Section 3.7 of the Amended Plan that altered the parties' Article 9 rights in the Lift Proceeds.

Additionally, Section 3.4.13.b of the Amended Plan expressly refers to the pre-petition documents executed by Machinery in defining the scope of the secured creditors' rights in Machinery's post-confirmation assets. The Court, therefore, finds that Section 3.4.13.b of the Amended Plan, which specifically addresses the secured creditors' rights in Machinery's post-confirmation assets, points to applicable state law, specifically Missouri's version of Article 9, in governing the parties' rights in the Lift Proceeds.

■■■ The next question is whether Revised Article 9 applies in determining the parties' relative interest in the Lift Proceeds. Revised Article 9 applies to any lien or transaction after July 1, 2001, regardless of when the lien was originally created. Mo.Rev.Stat. § 400.9–702(a). Therefore, the rules contained in Revised Article 9 apply with respect to any security interest after July 1, 2001, even if the secured transaction was originally executed prior to the effective date of Revised Article 9. Mo.Rev.Stat. § 400.9–702, *cmt.* 1. Here, because the Lift Proceeds were generated on or after October 1, 2001, Revised Article 9 applies even though the liens of both GE Capital and Union Planters were created prior to the effective date of Revised Article 9.

*C. Union Planters took the Lift Proceeds Free and Clear of GE Capital's Senior Security Interest under Revised Article 9.*

■■■ GE Capital argues that even if Revised Article 9 applies, its senior securi-

---

**2.** If anything, therefore, Section 3.7 of the Amended Plan attempted to override the provisions of Article 9 in favor of Union Planters.

ty interest in the Lift Proceeds remained valid after Machinery deposited those proceeds into Machinery's general account at Union Planters. The Court disagrees.

Section 9–332 of Revised Article 9 recites that a transferee of cash proceeds takes the cash free of any security interest in the cash proceeds unless the transferee acts in collusion with the debtor in violating the rights of the secured party. Mo. Rev.Stat. § 400.9–332(a). The Court does not believe the evidence adduced at trial demonstrates that Union Planters colluded with Machinery to violate GE Capital's rights in the Lift Proceeds. Thus, the Court finds that Union Planters took the Lift Proceeds free of GE Capital's senior security interest under Mo.Rev.Stat. § 400.9–332(a).

Section 9–332 of Revised Article 9 is completely new and is a codification of comment 2(c) to section 9–306 of Prior Article 9. Section 9–306 of Prior Article 9 contained the basic rule that a secured party's security interest continued in proceeds of the original collateral. Comment 2(c) noted, however, that this general rule only applied to a transferee of cash proceeds if the transferee took the proceeds outside of the ordinary course of business.

The Eighth Circuit held that Comment 2(c) to § 9–306 of prior Article 9 protected a transferee of cash proceeds unless the transferee took the cash "out of the ordinary course of business or otherwise in collusion with the debtor". *Gen. Elec. Capital Corp. v. Union Planters Bank, N.A.,* 409 F.3d 1049, 1056 (8th Cir.2005). The transferee's knowledge of the existence of the secured party's security interest was insufficient to take the transfer out of the scope of Comment 2(c), even if the transferee was a junior secured creditor. *Id.* at 1058. Additionally, the transferee was under no duty to identify and segregate the cash proceeds even if it knew of

the secured party's interest, provided that the transferee had no contractual obligation to do so. *Id.* at 1057. Rather, the secured creditor was required to demonstrate something more than the transferee's mere knowledge of its security interest to prove that the payment was outside the ordinary course of business. *Id.* at 1058–59; *Barber–Greene Co. v. Nat'l. City Bank,* 816 F.2d 1267, 1272 (8th Cir.1987).

GE Capital argues quite persuasively that Union Planters did not receive the Lift Proceeds in the ordinary course of business. But the ordinary course of business test is the standard under Prior Article 9. Revised Article 9 is significantly more differential to transferees of cash proceeds because it requires the secured creditor to show that the transferee acted in collusion with debtor in receiving the funds rather than merely taking them out of the ordinary course. Barkley Clark & Barbara Clark, The Law Of Secured Transactions Under The Uniform Commercial Code, ¶ 10.01[2][G]. Thus, there are cases where the secured party would have prevailed under comment 2(c) to section 9–306 but cannot prevail under the more deferential collusion standard contained section 9–332(a) of Revised Article 9.4 White & Summer, Uniform Commercial Code § 33–19.5 (5th ed.2005). The Court believes that this is such a case.

The drafters of Revised Article 9 stated that the purpose underlying section 9–332 was to ensure that security interests in cash proceeds and deposit accounts do not impede the flow of funds in the banking system. Mo.Rev.Stat. § 400.9–332, *cmt.* 3. Thus, only truly "bad actor" transferees of cash proceeds are not protected by the collusion standard of § 9–332(a). Mo.Rev. Stat. § 400.9–322, *cmt.* 4. The drafters additionally noted that the collusion standard is the most protective contained in the UCC and pointed to the protection afford-

ed to transferees from securities intermediaries under Article 8 of the UCC for guidance as to what constitutes collusion under § 9–332. *Id.*

Article 8 recites that the principles contained in Restatement (Second) of Torts § 876 (1977) govern the collusion standard under the UCC. Mo.Rev.Stat. § 400.8–115 *cmt* 5. Section 876 recites that a person may be liable for the injury to a third-party inflicted by another if that person: (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

■ Missouri courts have held that a person may only be liable for the action of another under the collusion standard of Section 876 of the Restatement if there is evidence that the two parties acted pursuant to an agreement or otherwise in concert with each other. *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 245 (Mo.1984); *Richardson v. Holland*, 741 S.W.2d 751, 754 (Mo.Ct.App.1987). Missouri courts also require that the purpose of the concerted action be illegal, fraudulent or otherwise wrongful towards the injured third-party. *Weaver v. Schaaf*, 520 S.W.2d 58, 66 (Mo. 1975); *Macke v. Laundry Serv. v. Jetz Serv. Co.*, 931 S.W.2d 166, 179 n. 6 (Mo.Ct. App.1996). Missouri law additionally requires that the defendant's action itself, separately considered, be wrongful with respect to the injured third-party. *Richardson*, 741 S.W.2d at 754; *see also* Restatement (Second) of Torts § 876 *cmt.* c.

GE Capital first argues that Union Planter's cooperation with Machinery in formulating the terms of the Amended Plan constitutes collusion under § 9–332(a). As discussed in the Court's findings of fact, GE Capital did adduce evidence at trial that Union Planters negotiated extensively with Machinery in formulating the terms of the Amended Plan. GE Capital also produced evidence that Machinery was quite amenable to including provisions in the Amended Plan that favorably treated Union Planters.

This behavior, however, does not rise to the level of collusion between Union Planters and Machinery under § 9–332(a). There is no question that Union Planters vigorously attempted to protect and even expand its Article 9 rights in Machinery's post-confirmation assets in negotiating with Machinery. But Missouri law requires that Union Planter's action in protecting its rights, separately considered, to be wrongful with respect to GE Capital. *See also* Restatement (Second) of Torts § 876, *cmt.* c. (Noting that a person does not collude with another when that person rightfully acts, even if that action has the effect of furthering the tortuous conduct of the other). And Union Planters certainly had the right to vigorously attempt to receive the most favorable treatment it could in the Amended Plan. Thus, the Court cannot find that Union Planters colluded with Machinery in negotiating the terms of the Amended Plan.

■ GE Capital also contends that Union Planters should not be afforded the protection of § 9–332(a) because Union Planters could have segregated the Lift Proceeds, but failed to do so. As stated above, however, a junior secured creditor was under no obligation to identify and segregate cash proceeds for the benefit of the senior secured creditor under Comment 2(c) to § 9–306 to Prior Article 9. *Union Planters*, 409 F.3d at 1057. This was the case even if the junior secured

creditor knew of the senior secured party's interest. *Id.* Given that the collusion standard in § 9–332(a) is more deferential to transferees, § 9–332(a) does not impose a duty on a transferee of cash proceeds to identify and segregate the proceeds absent a contractual obligation to do so. *See* 4 White & Summer, Uniform Commercial Code, § 33–10 (5th ed.2005); William D. Hawkland, Hawkland Uniform Commercial Code Series, § 9–205:1.

Here, GE Capital failed to require Machinery to segregate the Lift Proceeds from its other post-confirmation cash proceeds. Rather, Machinery simply remitted the Lift Proceeds into its general account at Union Planers as required by Section 3.4.2(c) of the Amended Plan. Further, and most importantly, Union Planters was under no contractual obligation to identify and segregate the Lift Proceeds. Given this evidence, the Court finds that Union Planters did not collude with Machinery under 9–332(a) in receiving but failing to identify and segregate the Lift Proceeds.

 GE Capital additionally contends that Union Planters did not take the Lift Proceeds free of its interest under § 9–332(a) because Union Planters actively participated in Machinery's post-confirmation operations. The Court does believe that GE Capital adduced credible evidence that Union Planters played an active role in Machinery's post-confirmation operations, particularly just prior to and after Machinery's default on its obligations under the Amended Plan.

Such evidence would be sufficient to find that Union Planters took the Lift Proceeds out of the ordinary course of business under Comment 2(c) to Prior Section 9–306. *See Union Planters,* 409 F.3d at 1058–59; *Barber–Greene,* 816 F.2d at 1272–73. But, as illustrated above, the collusion standard contained in § 9–332(a) of Revised Article

9 is more protective of transferees of cash proceeds in that it requires the senior secured party to demonstrate actual collusion between the debtor and cash transferee.

Here, there is no evidence that Union Planters had any duty or obligation to GE Capital to act in a particular manner with respect to Machinery's operation. Nor is there any evidence that Union Planters required or encouraged Machinery to violate its obligations to GE Capital when Union Planters began to more closely monitor Machinery's post-confirmation operation. In fact, as discussed above, Union Planters was receiving the Lift Proceeds because the Amended Plan required Machinery to place those proceeds into its account at Union Planters. Simply put, there is no evidence that Union Planters' activity in participating in Machinery's post-confirmation operation was, when separately considered, wrongful in any way to GE Capital. GE Capital, therefore, failed to establish that Union Planters acted in collusion with Machinery under Mo. Rev.Stat. § 400.9–332(a) in participating in Machinery's operation.

GE Capital finally argues that ATEC was acting as Union Planters' agent in winding down Machinery's operations. GE Capital, therefore argues that ATEC's actions should be imputed to Union Planters. The evidenced adduced at trial, however, does not support GE Capital's contention. ATEC's president, Paul Lerman, testified that although Union Planter's contacted him about winding down Machinery's operation, ATEC was working to protect the interest of, and responsible to, all of Machinery's secured creditors.

The Court finds that there is insufficient evidence to find an agency relationship between ATEC and Union Planters with respect to ATEC's winding down Machin-

ery's operation. Accordingly, there was no concert of action between Union Planters and Machinery to support a finding of collusion under Missouri law between Machinery and Union Planters with respect to ATEC's winding down of Machinery's operation.

 Additionally, even assuming *arguendo* that there was some concerted action between Union Planters and Machinery, there is no evidence that Union Planters' action in retaining ATEC to wind down Machinery's operation, when separately considered, was in any way wrongful to GE Capital. Rather, Union Planters was simply attempting to rightfully protect its interest in Machinery's remaining assets when retaining ATEC. GE Capital produced no evidence that Union Planters directed ATEC to act in particular manner that was illegal, fraudulent or in any way wrongful with respect to GE Capital. Therefore, even if there was some concert of action between Union Planters and ATEC, there is no evidence that the action constituted collusion under Missouri law.

In conclusion, § 9–332(a) of Revised Article 9 provides significant protection to transferees of cash proceeds. Specifically, § 9–332(a) of Revised Article 9 mandates that provided that the transferee of the cash proceeds is not truly a "bad actor" and colludes with the debtor, the transferee will take the cash proceeds free of the senior secured party's interest. GE Capital has failed to produce evidence that Union Planters was such a bad actor and colluded with Machinery to violate GE Capital's rights in the Lift Proceeds. Union Planters, therefore, took the Lift Proceed free of GE Capital's senior security interest under Mo.Rev.Stat. § 400.9–332(a).

## CONCLUSION

Missouri's version of Revised Article 9 governs the parties' respective rights in the Lift Proceeds. Section 9–332(a) of Revised Article 9 provides that a transferee of cash proceeds takes free of a senior secured party's interest in those proceeds unless the transferee acted in collusion with the debtor to violate the rights of the senior secured party.

GE Capital failed to produce evidence that Union Planters colluded with Machinery in violating GE Capital's senior rights in the Lift Proceeds. Union Planters, therefore, took the Lift Proceeds free of GE Capital's senior security interest under Mo.Rev.Stat. § 400.9–332(a). Thus, GE Capital did not have the immediate right to possess the Lift Proceeds when it demanded them from Union Planters. Accordingly, Union Planters did not convert GE Capital's senior interest in the Lift Proceeds under Missouri law. The Court will accordingly enter judgment in favor of Union Planters.

The above constitutes the Court's findings of fact and conclusions of law under Bankr. R. 7052.